IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARTIN HERDMAN, WAYNE WESTOVER, and ROBERT WILLIAMS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> L-J-L TRUCKING, INC. d/b/a MED-VAN TRANSPORT, <br><br> Defendant. | CIVIL ACTION NO.   3:21-cv-213 <br><br> CLASS ACTION COMPLAINT <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Martin Herdman, Wayne Westover, and Robert Williams, are filing this Complaint on behalf of themselves and all others similarly situated, seeking relief for the discrimination they were subjected to and the unlawful termination of their employment by L-J-L Trucking, Inc.

## THE PARTIES

1. Plaintiff Martin Herdman is an adult individual who resides in Northern Cambria, Pennsylvania.

2. Plaintiff Wayne Westover is an adult individual who resides in Northern Cambria, Pennsylvania.

3. Plaintiff Robert Williams is an adult individual who resides in Brackenridge, Pennsylvania.

4. Defendant L-J-L Trucking, Inc., which does business as Med-Van Transport ("Med-Van"), is a Pennsylvania corporation with its principal office located at 1311 Philadelphia Avenue, Northern Cambria, Pennsylvania 15714.

5. At all relevant times, Med-Van continuously employed more than 15 employees and was a covered employer as defined by the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101 *et seq*.).

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that Plaintiffs' claims arise under the laws of the United States and Plaintiffs seeks redress for violations of federal laws.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b)(2) as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL BACKGROUND

8. Med-Van is a transportation company that provides non-emergency medical transportation services to residents, nursing homes, hospitals, rehabilitation centers, and dialysis clinics in the Western Pennsylvania region.

9. Med-Van began its operations in 1995 with a staff of 6 people and 3 vehicles. Since its inception, Med-Van has grown grew considerably and, at one point, employed over 200 individuals and maintained a fleet of 125 vehicles.

10. Med-Van is owned by Louis Monborne, who also acts as the company's President.

11. Monborne has final authority over every aspect of Med-Van's business.

12. In 2020, the COVID-19 virus caused a global pandemic and impacted businesses throughout Pennsylvania.

13. Monborne was worried that the pandemic would impact Med-Van's revenue, and in March 2020, he held a meeting with Med-Van's senior managers to discuss layoffs.

14. During that March 2020 meeting, Monborne instructed his senior managers to target for layoffs employees who were disabled ("Protected Class Employees"). Monborne specifically told his senior managers to notify these Protected Class Employees that they were being temporarily laid off due to the COVID-19 pandemic, and that they would be rehired once business picked up again.

15. Monborne, however, made it clear to his senior managers that these Protected Class Employees would never be rehired and that their layoffs would actually result in the permanent termination of their employment with the company.

16. Following Monborne's instructions, Med-Van laid of nearly all of its Protected Class Employees during the pandemic under the guise of a downturn in business.

17. Following the layoffs of the Protected Class Employees, Med-Van hired non-disabled employees to replace those Protected Class Employees who were laid off.

18. To this day, none of the Protected Class Employees who were laid off have been recalled despite the availability of work.

19. To this day, the majority of the Protected Class Employees who were laid off during the pandemic are unaware that Monborne directed his senior managers never to rehire them again.

20. Med-Van's decision to target and fire its Protected Class Employees during the COVID-19 pandemic is just one example of a pattern and practice of discriminatory behavior that has existed within the company for years because Med-Van

a. Fails to provide training for its employees on the company's EEO-related policies;

b. Refuses to implement policies and procedures which would allow for the proper enforcement of the company's EEO-related policies;

c. Lacks human resources personnel, or any individual with responsibility of ensuring Med-Van's compliance with EEO-related policies;

d. Promotes a culture of intolerance which allows employees who violate EEO-related laws to act without fear of punishment;

e. Rewards employees who disregard EEO-related policies when it financially benefits the company;

f. Acts as a vehicle for the machinations of Monborne, who has repeatedly prioritized profitability over compliance with federal and state laws.

**A.    Currently Identified Class Members**

**Martin Herdman**

21. In April 2014, Herdman began his employment with Med-Van as a Paratransit Driver.

22. In August 2017, Herdman was diagnosed with cancer.

23. Herdman received chemotherapy and radiation as part of his cancer treatment. As a result of these treatments, Herdman was off work for approximately 7 months.

24. In 2018, Herdman was medically cleared to return to work. However, when Herdman returned to work, Med-Van reduced the number of hours that Herdman worked per week.

25. In response, Herdman repeatedly notified Med-Van that he was working between 10-20 hours less per week than he had been prior to his medical leave. Med-Van, however, refused to assign Hardman additional hours.

26. At all times relevant, Hardman was able to perform the essential duties of the Paratransit Driver position.

27. On March 27, 2020, Herdman was called into Med-Van's offices by the company's dispatcher, Larry Curtis. Curtis informed Herdman that because he had a compromised immune system, he was being laid off.

28. In March 2020, Hardman had not told Med-Van that he had a compromised immune system.

29. In March 2020, Hardman did not have any medical issues which would impact his ability to perform the essential duties of the Paratransit Driver position had he been provided with a reasonable accommodation.

30. Hardman was never recalled to work for Med-Van despite the company's need to fill open Paratransit Driver positions throughout 2020 and 2021.

31. Upon information and belief, Med-Van has repeatedly posted notices that the company was hiring individuals for open Paratransit Driver positions throughout 2020 and 2021.

32. Med-Van regarded Hardman as disabled due to his medical history and used Hardman's medical history information to discriminate against him and as justification to terminate his employment in March 2020 under the guise of a temporary layoff.

**Wayne Westover**

33. In April 2010, Westover began his employment with Med-Van as a Paratransit Driver.

34. In 2015, Westover developed arthritis and had to undergo an ankle fusion procedure. As a result, Westover was off work for approximately 6 weeks.

35. When Westover was medically cleared to return to work, Med-Van refused to provide any accommodations for his arthritis. In fact, when Westover asked for an accommodation to complete one transport, Monborne became upset, publicly chastised Westover, and called Westover lazy.

36. On March 21, 2020, Rodney Stafford, a senior manager at Med-Van, told Westover that he would be laid off for approximately 3 weeks due to the COVID-19 pandemic. Stafford explained that the layoff was temporary and that it was due to a downturn in business.

37. Westover was never recalled to work for Med-Van despite the company's need to fill open Paratransit Driver positions throughout 2020 and 2021.

38. Upon information and belief, Med-Van has repeatedly posted notices that the company was hiring individuals for open Paratransit Driver positions throughout 2020 and 2021.

39. Upon information and belief, Med-Van used Westover's past medical history and status as a disabled individual as justification to terminate his employment in March 2020 under the guise of a temporary layoff.

**Robert Williams**

40. In September 2019, Williams began his employment with Med-Van, filling a variety of roles, which included working as dispatch, providing EMT services, and managing administrative tasks for the company.

41. Williams has asthma and is a disabled individual because his asthma substantially limits one or more major life activities.

42. Williams repeatedly requested Med-Van provide accommodations for his asthma, but all of Williams' accommodation requests were denied.

43. On March 19, 2020, Med-Van offered Williams the opportunity to be temporarily laid off due to an alleged downturn in business. Williams agreed to the temporary layoff because (a) Med-Van continued to refuse to provide Williams with any accommodations for his asthma and (b) Med-Van assured Williams that the lay off was temporary and that he would be recalled as soon as there was work for him.

44. Williams was never recalled to work for Med-Van despite an uptick in business, and the availability of work that Williams was previously performing for the company, throughout 2020 and 2021.

45. Upon information and belief, Med-Van used Williams' status as a disabled individual as justification to terminate his employment in March 2020 under the guise of a temporary layoff.

### B.  Exhaustion of Administrative Remedies

46. In September 2020, Plaintiffs continued to believe that their layoffs with Med-Van were temporary and that they would be recalled by the company when there was work available.

47. During the September-November 2020 period, Plaintiffs were notified by two, former senior managers ("Whistleblowers") at Med-Van that their temporary layoffs with the company were in fact not temporary, but permanent, and that Med-Van would never be recalling them to work for the company.

48.    The Whistleblowers informed the Plaintiffs that the decision to terminate Plaintiffs' employment was made by Monborne, and that Monborne had ordered all the senior managers at Med-Van to never recall the Protected Class Employees to work at Med-Van.

49.    As a direct result of the information provided by the Whistleblowers, Plaintiffs began the process of exhausting their administrative remedies.

50.    Williams dual-filed a Complaint against Med-Van with the Pennsylvania Human Relations Commission ("PHRC") and Equal Employment Opportunity Commission ("EEOC") on November 12, 2020.

51.    Herdman and Westover filed Charges of Discrimination against Med-Van with the EEOC on January 14, 2021.

52.    After the Plaintiffs filed their claims with the EEOC and PHRC, Monborne took steps to retaliate against the Plaintiffs and the Whistleblowers, which included

  a. Directing certain companies not to do business with the Plaintiffs and the Whistleblowers;

  b. Directing individuals to harass Plaintiffs on Facebook because they filed claims with the EEOC and PHRC against Med-Van;

  c. Repeatedly driving by the residences of Plaintiffs and Whistleblowers, at all hours, in an attempt to intimidate them from proceeding with their legal claims;

  d. Having law enforcement officers park in the driveway of the Whistleblowers' residence in an attempt to influence the Whistleblowers to dissuade the Plaintiffs' from proceeding with their legal claims against Med-Van;

53.    By letter dated September 13, 2021, the EEOC notified Plaintiffs of their right to file a civil action against Med-Van.

54.    Plaintiffs have initiated this civil action within 90 days of receiving the EEOC's Right to Sue letter.

55.     For all applicable claims, Plaintiffs have exhausted their administrative remedies under federal and Pennsylvania law.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other employees of Med-Van whose employment was terminated because of their status as disabled individuals.

57.     Med-Van has acted or refused to act on grounds generally applicable to the Class, thereby making a class-wide ADA action the appropriate remedies for the Class.

58.     While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are approximately 10 former employees who were discriminated against and/or fired because of their status as disabled individuals.

59.     Plaintiffs' claims are typical of those members of the Class, as all members were discriminated against and/or fired because of their status as disabled individuals. Accordingly, the defenses available to the representative claims raised by Plaintiffs will also be typical to the Class.

60.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a.      Whether Plaintiffs are disabled individuals under the ADA;

b.      Whether Med-Van terminated Plaintiffs' and other Class members' employment under the guise of temporary layoffs due to the COVID-19 pandemic;

c.      Whether Med-Van terminated Plaintiffs' and other Class members' employment for reasons that had nothing to do with performance;

d.      Whether Med-Van terminated Plaintiffs' and other Class members' employment for reasons that had nothing to do with business necessity;

    e.       Whether Plaintiffs' and other Class members' employment was terminated for legitimate and non-discriminatory reasons.

61. Plaintiffs will fairly and adequately protect the interests of Class. Plaintiffs have retained counsel who are competent and experienced in class action litigation and with adequate resources to assure the interests of the Class are protected.

62. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable and common questions of law and fact predominate over any individual questions affecting only individual members. A class action will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. There will be no difficulty in the management of this action as a class action.

63. The Class members are ascertainable because every potential Class member can be identified from Med-Van's regularly maintained employee personnel records. Accordingly, a review of Med-Vans' records maintained in the ordinary course of business is all that is necessary to determine the members of this Class.

## STATEMENT OF CLAIMS

### COUNT I
Violations of the ADA
(On Behalf of all Plaintiffs and Similarly Situated Individuals v. Med-Van)

64. Plaintiffs incorporates by reference the allegations in Paragraphs 1 through 63, as if fully set forth herein.

65. Plaintiffs are disabled individuals as defined by the ADA.

66. It is believed that Med-Van acted willfully and in reckless disregard of Plaintiffs' rights under the ADA when they failed to engage in the interactive process, refused to provide reasonable accommodations for Plaintiffs' disabilities, and/or believed that due to Plaintiffs' disabilities, they were or would be unable to perform the essential functions of their job.

67. The stated reasons for the ending of Plaintiffs' employment with Med-Van were pretext. It is believed that Plaintiffs' firings from Med-Van was part of a pattern and practice of behavior by the company in which disabled individuals were illegally targeted and permanently removed from the company under the guise of temporary layoffs and/or other pretextual reasons.

68. The acts and omissions by Med-Van that are described in this Complaint constitute unlawful discrimination under the ADA.

69. As a proximate result of Med-Van's conduct, Plaintiffs and other Protected Class Employees have or will suffer substantial harm, for which they seek general, compensatory, and liquidated damages.

## COUNT II
Violations of the Rehabilitation Act of 1973
(On Behalf of all Plaintiffs and Similarly Situated Individuals v. Med-Van)

70. Plaintiffs incorporates by reference the allegations in Paragraphs 1 through 69, as if fully set forth herein.

71. Plaintiffs are disabled individuals as defined by the Rehabilitation Act of 1973 ("Rehabilitation Act" – 29 U.S.C. §§ 701 *et seq.*).

72. Because Med-Van received federal loans in 2020 and 2021 as part of the Paycheck Protection Program, Med-Van was subjected to the requirements of the Rehabilitation Act in 2020 and 2021.

73. It is believed that Med-Van acted willfully and in reckless disregard of Plaintiffs' rights under the Rehabilitation Act when they failed to engage in the interactive process, refused to provide reasonable accommodations for Plaintiffs' disabilities, and/or believed that due to Plaintiffs' disabilities, they were or would be unable to perform the essential functions of their job.

74. The stated reasons for the ending of Plaintiffs' employment with Med-Van were pretext. It is believed that Plaintiffs' firings from Med-Van was part of a pattern and practice of behavior by the company in which disabled individuals were illegally targeted and permanently removed from the company under the guise of temporary layoffs and/or other pretextual reasons.

75. The acts and omissions by Med-Van that are described in this Complaint constitute unlawful discrimination under the Rehabilitation Act.

76. As a proximate result of Med-Van's conduct, Plaintiffs and other Protected Class Employees have or will suffer substantial harm, for which they seek general, compensatory, and liquidated damages.

## REQUESTS FOR RELIEF

Accordingly, Plaintiffs requests that this Court enter judgment, on their behalf and on behalf of all other similarly situated individuals, and enter an order directing the award of other relief, as follows:

A. Declaring this action to be class action properly maintained under Rule 23 of the Federal Rules of Civil Procedure, and certifying Wayne Westover as the Class representative;

B. Entering an order requiring Med-Van to provide Plaintiffs with the names, dates of birth, and last known contact information, including physical addresses, e-mail addresses, and telephone numbers of all individuals who were laid off in 2020 and 2021;

C. Entering an order directing that notice and opportunity to opt-in be given to all former employees of Med-Van with disabilities whose employment ended from 2020 to present;

D. Finding that Med-Van violated the ADA;

E. Finding that Med-Van violated the Rehabilitation Act;

F. Awarding Plaintiffs and other similarly situated employees back pay, front pay, lost benefits, and other emoluments of employment and such other relief as is necessary to make them whole;

G. Awarding Plaintiffs compensatory damages for pain, humiliation, emotional distress, and damage to reputation;

H. Awarding Plaintiffs punitive damages under the ADA and the Rehabilitation Act;

I. Awarding Plaintiffs, and all other similarly situated individuals, attorneys' fees and costs;

J. Awarding Plaintiffs and other similarly situated individuals pre- and post-judgment interest as provided by law; and

K. Awarding Plaintiffs and other similarly situated individuals any other relief to which they are entitled and/or which this Court deems necessary and proper.

Respectfully submitted,

/s/ Sammy Y. Sugiura
Sammy Y. Sugiura
PA I.D. No. 209942
ssugiura@cohengrace.com
COHEN & GRACE, LLC
105 BRAUNLICH DRIVE
SUITE 300
PITTSBURGH, PA 15237
TELEPHONE: (412) 847-0300
FACSIMILE: (412) 847-0304

**COUNSEL FOR PLAINTIFF**